UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                                                  :

CAPLOC, LLC,                                                                           __ Civ. ____ (____)

                                Plaintiff,

     -against-

RON McCORD, CBB, INC., CITIZENS STATE
BANK, SPIRITBANK, AMERICAN SOUTHWEST
MORTGAGE CORP. f/k/a AMERICAN CAPITAL
MORTGAGE COMPANY, INC., AMERICAN
SOUTHWEST MORTGAGE FUNDING CORP.,
and FIRST MORTGAGE COMPANY, LLC,

                              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## COMPLAINT

Plaintiff, CAPLOC, LLC ("CapLOC") for its Complaint against Defendants, RON MCCORD ("McCord"), CBB, INC. ("CBB"), CITIZENS STATE BANK ("Citizens"), SPIRITBANK ("Spirit"), AMERICAN SOUTHWEST MORTGAGE CORP. f/k/a AMERICAN CAPITAL MORTGAGE COMPANY, INC. ("ASMC"), AMERICAN SOUTHWEST MORTGAGE FUNDING CORP. ("ASMFC"), and FIRST MORTGAGE COMPANY, LLC ("FMC"), states as follows:

## SUMMARY

CapLOC formed in early 2017 to provide warehouse lending to mortgage lenders that might become available for acquisition. FMC and McCord represented that FMC would be willing to sell its mortgage lending business, but that it needed cash quickly from a new warehouse lender if it was going to survive as a going concern. At the time, CapLOC had the funding capacity, but lacked the infrastructure necessary to perform all of the analytical and custodial functions of a warehouse lender. Defendants assured CapLOC that they possessed the expertise required to fulfill those functions and promised to perform those functions for

CapLOC's benefit while CapLOC built its operations. McCord and FMC emphasized that time was of the essence and unless CapLOC began funding loans quickly, FMC risked going under.

In reliance on Defendants' representations, CapLOC entered into a series of transactions dated March 30, 2017, where it agreed to provide a line of credit to fund new loans originated by FMC. Each of the Defendants played a substantial role in inducing CapLOC to provide funding, and each Defendant participated in and benefited from the remarkably fraudulent conduct that ensued. Once CapLOC's agreement to fund loans was secured, Defendants almost immediately began wrongfully taking CapLOC's funds, ultimately paying themselves approximately $34 million of CapLOC's money by selling to CapLOC (1) loans that breached the parties' agreements without disclosing the ineligible nature of those loans, and (2) "double-note" loans that had been previously paid off or sold to other investors, and are thus worthless. Upon discovering Defendants' fraud, CapLOC demanded repurchase of the ineligible loans. Defendants rebuffed CapLOC's demand. CapLOC brings this suit to recover the losses it suffered as a result of Defendants' brazen fraud and for all other damages and relief allowed by law.

**PARTIES**

1. CapLOC is a North Carolina limited liability company with its principal place of business in North Carolina.

2. Ron McCord is an individual residing in Oklahoma, and may be served at 6701 N. Broadway, Ste. 400, Oklahoma City, Oklahoma 73116.

3. CBB is an Oklahoma corporation and may be served through its registered agent, Gary L. Giessmann, 4101 Perimeter Center Dr., Ste. 200, Oklahoma City, Oklahoma 73112.

4. Citizens is an Oklahoma banking corporation and may be served through an officer, director, manager, or controlling person at 402 W. Broadway St., Okemah, Oklahoma 74859.

5. Spirit is an Oklahoma banking corporation and may be served through an officer, director, manager, or controlling person at 4815 S. Harvard, Ste. 100, Tulsa, Oklahoma 74135.

6. ASMC is an Oklahoma corporation and may be served through its registered agent, Gary L. Giessmann, located at 4101 Perimeter Center Dr., Ste. 200, Oklahoma City, Oklahoma 73112.

7. ASMFC is an Oklahoma corporation and may be served through its registered agent, Richard Carrington, located at 5900 Mosteller Dr., Ste. 200, Oklahoma City, Oklahoma 73112.

8. FMC is an Oklahoma limited liability company and may be served through its registered agent, Ron McCord, located at 6701 N. Broadway, Ste. 400, Oklahoma City, Oklahoma 73116.

## JURISDICTION & VENUE

9. Subject matter jurisdiction is founded on diversity of citizenship under 28 U.S.C. § 1332. The parties are completely diverse. CapLOC is a citizen of North Carolina because all of its members are citizens of North Carolina. Defendant McCord is a citizen of Oklahoma because he resides and is domiciled in Oklahoma. Defendants CBB, ASMC, and ASMFC are citizens of Oklahoma because each is incorporated in Oklahoma and has its principal place of business in Oklahoma. Defendant FMC is a citizen of Oklahoma because all of its members are citizens of Oklahoma. Defendant Spirit is a citizen of Oklahoma because it is chartered in Oklahoma and its main office is in Oklahoma. Defendant Citizens is a citizen of Oklahoma because it is chartered in Oklahoma and its main office is in Oklahoma. The amount in controversy exceeds the minimal jurisdictional requirements of this Court because CapLOC seeks money damages, equitable relief, and legal fees in excess of $75,000.00, exclusive of costs.

10. The Court has personal jurisdiction over Defendants because Defendants FMC and McCord contractually waived any right to contest this Court's jurisdiction, and because,

upon information and belief, Defendants have sufficient minimum contacts with this district, and exercising jurisdiction would not offend traditional notions of fair play and substantial justice.

11. Venue is proper in this district under 28 U.S.C. § 1391 because CapLOC, FMC, and McCord agreed to venue in this Court and the other Defendants conspired with McCord and FMC in the wrongful conduct alleged herein.

## FACTUAL BACKGROUND

### A. The Defendants' Relationships

12. McCord is the CEO and owner of FMC, a mortgage lending company.

13. ASMC is a wholly-owned subsidiary of Spirit, and provided funding for loans originated by FMC.

14. ASMFC is a wholly-owned subsidiary of Citizens, and along with ASMC, provided funding for loans originated by FMC.

15. CBB is, upon information and belief, associated with ASMC and ASMFC under a management agreement, whereby CBB acts and acted as the manager and custodian agent under the warehouse lending agreements between ASMC, ASMFC, and FMC.

### B. ASMC and ASMFC's Warehouse Lending to FMC

16. On or about August 3, 2000, ASMC and FMC entered into a Residential Mortgage Loan and Purchase Agreement ("ASMC Loan Agreement").

17. Under the ASMC Loan Agreement, ASMC operated as a warehouse lender to fund residential home loans originated by FMC.

18. The ASMC Loan Agreement gave FMC a $200 million loan commitment to fund mortgage loans.

19. On or about September 5, 2013, ASMFC and FMC entered into a Residential Mortgage Loan Origination and Purchase Agreement ("ASMFC Loan Agreement").

4

20. Under the ASMFC Loan Agreement, ASMFC operated as a second warehouse lender along with ASMC to fund residential home loans originated by FMC.

21. The ASMFC Loan Agreement gave FMC a $140 million loan commitment to fund mortgage loans.

22. Loans funded under the ASMC and ASMFC Loan Agreements were owned by ASMC or ASMFC until they were marketed and sold to an investor.

23. Advances to FMC under the ASMC and ASMFC Loan Agreements bore interest which FMC was required to pay back along with the principal.

24. CBB acted as the manager and custodian agent for ASMC and ASMFC under the ASMC and ASMFC Loan Agreements, was responsible for keeping, maintaining, and delivering loan documents, and received a fee for every loan funded by ASMC or ASMFC.

C. **FMC's Liquidity Problem**

25. Between 2015 and 2016, FMC experienced a loss in profitability that reduced its liquidity.

26. By January 2017, FMC's liquidity was insufficient to handle haircuts, operations, buybacks, and other unforeseen events. FMC was over-leveraged and its capital base could not support additional business initiatives or production increases.

27. Upon information and belief, FMC began using funds from its Fannie Mae custodial accounts to cover operational expenses.

28. FMC's liquidity problem meant it could not timely meet its payment obligations to ASMC and ASMFC under the terms of the ASMC and ASMFC Loan Agreements, respectively.

29. At the end of 2015, FMC owed more than $275 million total to ASMC and ASMFC.

30. McCord admitted that FMC needed to expand its warehouse relationships and replace either ASMC or ASMFC because Spirit and Citizens had reached their maximum capacity to lend FMC money for new loans.

31. Without funding from the warehouse lenders for new loans, CBB could not collect its fee for each new loan.

32. Thus, FMC's financial troubles gave all Defendants an incentive to find a new source of funding for FMC-originated loans.

**D.  McCord Induces CapLOC to Provide Funding for New FMC Loans**

33. Towards the end of 2016, CapLOC's affiliate contacted McCord about potentially acquiring FMC.

34. McCord demonstrated an interest in selling FMC and/or its assets and allowed CapLOC's affiliate to conduct limited due diligence.

35. McCord represented, however, that FMC might not survive as a going concern unless it quickly obtained a new warehouse lender to fund loans.

36. McCord requested an agreement to provide warehouse lending while the parties negotiated an acquisition of FMC.

37. CapLOC was formed on March 14, 2017. At the time, CapLOC possessed the funding capabilities, but lacked the infrastructure and operations to perform the functions of a warehouse lender.

38. CapLOC communicated to McCord its lack of readiness to become FMC's warehouse lender.

39. McCord insisted on securing CapLOC's immediate agreement and promised that he, FMC, and the other Defendants would handle all warehouse lending functions on CapLOC's behalf while CapLOC built its operations

40. McCord emphasized that he and FMC were unable to wait for CapLOC to build its operations and that funding was required immediately for FMC to survive as a going concern.

41. McCord touted his and the other Defendants' expertise in the mortgage-lending industry and cited their history of working together in the industry in an effort to acquire CapLOC's early agreement to provide funding.

42. McCord promised that he, FMC, and the other Defendants would work together as they had for years, except for CapLOC's benefit, if CapLOC agreed to provide funding.

43. Based on McCord's representations, CapLOC agreed to extend a line of credit to fund new FMC loans, not old FMC loans and certainly not fraudulent notes.

44. To facilitate the arrangement, the parties entered into a series of agreements.

*(i)* **The CapLOC MRA**

45. On or about March 30, 2017, CapLOC, as Buyer, entered into a Master Repurchase Agreement ("CapLOC MRA") with FMC, as Seller.

46. The CapLOC MRA, like the ASMC and ASMFC Loan Agreements before it, established the terms by which CapLOC would provide lending to FMC for newly originated loans.

47. As of the date of the CapLOC MRA, ASMC and ASMFC ceased funding FMC-originated loans.

48. Nonetheless, ASMC and ASMFC agreed to maintain in the ordinary course of business the FMC-originated loans they each purchased which had yet to be sold to investors.

49. The CapLOC MRA affords CBB its same position, identifying it as the custodian for loans funded under the terms of the agreement.

50. FMC represented and warranted that each mortgage loan to be funded by CapLOC under the CapLOC MRA was an "Eligible Mortgage Loan." *CapLOC MRA*, § 11(g)(i). To qualify as an Eligible Mortgage Loan under the CapLOC MRA, the payments on the loan

7

must be current and the loan must not be in foreclosure, among other requirements. *Id.* at § 2. FMC agreed to notify CapLOC if any loans became ineligible, and agreed to repurchase those loans. *Id.* at §§ 12(c)(ii)(F) & 13(n).

### *(ii)   The McCord Guaranty*

51. Contemporaneously with the CapLOC MRA, McCord executed a Guaranty, whereby he unconditionally, irrevocably, and personally guaranteed payment and performance of all FMC's obligations to CapLOC under the CapLOC MRA and otherwise.

### *(iii)   The Service Agreement*

52. Contemporaneously with the CapLOC MRA and McCord Guaranty, CapLOC, CBB, and FMC entered into a Service Agreement.

53. Through the Service Agreement, CapLOC engaged CBB to act as CapLOC's agent and custodian to service the FMC-originated loans purchased under the CapLOC MRA, just as CBB had done under the ASMC and ASMFC Loan Agreements.

54. The terms of the Service Agreement and CapLOC MRA required CBB to send a daily list of loans to CapLOC for which funding was requested. FMC and CBB acknowledged in the Service Agreement that CapLOC may in its sole and absolute discretion fund loans originated by FMC "after the date of [the Service Agreement.]" *Service Agreement*, § 2. FMC and CBB expressly agreed that the loans presented to CapLOC for funding under the CapLOC MRA would <u>not</u> include loans that ASMC or ASMFC had committed to purchase or loans that were currently funded by ASMC or ASMFC. *Id.* FMC and CBB also acknowledged that the CapLOC MRA would govern funding for new FMC loans. *Id.* at Recitals.

55. ASMC and ASMFC are named beneficiaries of the Service Agreement. *See id.*, Recitals & § 1. Specifically, the CapLOC MRA and Service Agreement relieved ASMC and ASMFC of its funding requirements for new FMC-originated loans. *Id.* at § 1.

8

### E. Defendants Cause CapLOC to Purchase Approximately $34 million of Unauthorized Loans

56. Less than thirty (30) days after securing CapLOC's agreement to provide funding under the terms of the CapLOC MRA and Service Agreement, and without CapLOC's authorization, CBB requested funding for loans that were not eligible under the CapLOC MRA and Servicing Agreement.

57. Specifically, CBB, without CapLOC's knowledge or authorization requested funding for (1) loans that FMC originated before the date of the CapLOC MRA, (2) loans that were delinquent in payments or otherwise in default, and (3) loans that ASMC or ASMFC had bought or committed to purchase (collectively, "Unauthorized Loans").

58. None of the Defendants disclosed the ineligible status of the Unauthorized Loans. In fact, Defendants intentionally concealed the nature of the Unauthorized Loans as evidenced by CBB's funding requests which provided no information that would have allowed CapLOC to uncover the ineligible status of the Unauthorized Loans.

59. For instance, CBB's funding requests did not identify the loan origination date, the payment status of the loans, or that the loans were owned or funded by its associated entities, ASMC and ASMFC.

60. CapLOC trusted Defendants to perform all warehouse lending functions as promised, and not to present loans for funding that were expressly excluded by the CapLOC MRA and Service Agreement.

61. CapLOC relied on CBB's funding requests and authorized wire transfers in the total approximate amount of $34 million to Spirit and Citizens.

62. Defendants benefitted handsomely from CapLOC's purchase of the Unauthorized Loans. Specifically, some or all of the Unauthorized Loans were owned or funding-committed by ASMC or ASMFC. Thus, CBB caused a portion of the $34 million dollars to go directly to its associated entities, ASMC and ASMFC, and their parents, Spirit and Citizens. The removal of

those loans from ASMC and ASMFC's portfolios relieved payment obligations FMC owed to ASMC and ASMFC under the ASCM and ASMFC Loan Agreements. Likewise, CBB earned its fee under the ASMC and ASMFC Loan Agreements for each Unauthorized Loan that CapLOC purchased. All Defendants realized substantial gains at CapLOC's expense, while CapLOC was unknowingly taking on funding for the Unauthorized Loans that would result in significant losses.

**F.     Defendants Sell CapLOC Approximately $17 Million of "Double-Note" Loans**

63.     Upon learning of the purchase of the Unauthorized Loans, CapLOC demanded Defendants repurchase the Unauthorized Loans as required by the CapLOC MRA. Defendants refused, and to this date, continue to refuse to honor their repurchase obligations.

64.     Nonetheless, to secure its collateral, CapLOC began obtaining possession of the Unauthorized Loans and commissioned an audit.

65.     That audit is ongoing, but has uncovered to date that CapLOC, per CBB's funding requests, paid at least $17 million for loans that had already been paid off or that had already been sold or pledged to investors.

66.     In other words, approximately half of the Unauthorized Loans were not only ineligible under the terms of the CapLOC MRA and Service Agreement, but were altogether fraudulent.

67.     Some of the loans had been paid off years before they were sold to CapLOC in April and May 2017.

68.     Upon information and belief, all of these fraudulent loans were originated by FMC.

69.     Upon information and belief, some or all of these fraudulent loans were owned by ASMC, ASMFC, Spirit, and/or Citizens prior to being sold to CapLOC.

70.     On or about June 6, 2017, CapLOC ceased all funding for FMC loans.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
(Breach of CapLOC MRA against FMC)

71. CapLOC incorporates all preceding paragraphs for all purposes.

72. The CapLOC MRA is an enforceable agreement between CapLOC and FMC.

73. FMC's above-described conduct breached the CapLOC MRA. Specifically, and without limitation, FMC knowingly and intentionally caused CapLOC to purchase ineligible loans; FMC failed to notify CapLOC of the defective purchased loans; FMC refused to repurchase the Unauthorized Loans; and by causing the purchase of the Unauthorized Loans, FMC breached its warranty that purchased loans were current and performing.

74. CapLOC fully performed under the CapLOC MRA.

75. As a direct result of FMC's breach, CapLOC suffered actual and consequential damages, including the loss of the funds used to purchase the Unauthorized Loans, and the lost opportunities from freezing funding of eligible loans that CapLOC should have acquired under the parties' agreements. CapLOC is further entitled to recover its attorney's fees and costs under the CapLOC MRA.

### SECOND CLAIM FOR RELIEF
(Breach of McCord Guaranty against McCord)

76. CapLOC incorporates all preceding paragraphs for all purposes.

77. The McCord Guaranty is an enforceable agreement between CapLOC and McCord.

78. Pursuant to the McCord Guaranty, McCord is personally liable for FMC's breach of the CapLOC MRA. FMC's above-described conduct breached the CapLOC MRA. Specifically, and without limitation, FMC knowingly and intentionally caused CapLOC to purchase ineligible loans; FMC failed to notify CapLOC of the defective purchased loans; FMC

refused to repurchase the Unauthorized Loans; and by causing purchase of the Unauthorized Loans, FMC breached its warranty that purchased loans were current and performing.

79. As a direct result of FMC's breach of the CapLOC MRA and McCord's corresponding breach of the McCord Guaranty, CapLOC suffered actual and consequential damages, including the funds used to purchase the Unauthorized Loans and double-note loans, and the lost opportunities from freezing funding of eligible loans that CapLOC should have acquired under the parties' agreements, all of which McCord is personally liable under the McCord Guaranty. CapLOC is further entitled to recover its attorney's fees and costs under the McCord Guaranty.

## THIRD CLAIM FOR RELIEF
**(Breach of the Service Agreement against CBB and FMC)**

80. CapLOC incorporates all preceding paragraphs for all purposes.

81. The Service Agreement is a binding agreement between CapLOC and CBB and FMC.

82. Defendants' above-described conduct constitutes breach of the Service Agreement. Specifically, and without limitation, Defendants breached the Service Agreement by presenting the Unauthorized Loans to CapLOC for purchase and by failing to disclose and intentionally concealing the ineligible nature of the Unauthorized Loans.

83. CapLOC fully performed under the Service Agreement.

84. As a direct result of Defendants' breach, CapLOC suffered actual and consequential damages, including loss of the funds used to purchase the Unauthorized Loans, and the lost opportunities from freezing funding of eligible loans that CapLOC should have acquired under the parties' agreements.

## FOURTH CLAIM FOR RELIEF
### (Fraud against McCord, FMC, and CBB)

85. CapLOC incorporates all preceding paragraphs for all purposes.

86. McCord, FMC, and CBB made false representations or omissions of material fact to CapLOC.

87. Specifically, and without limitation, CBB, at McCord and FMC's direction, submitted funding requests to CapLOC for approximately $17 million worth of loans that had been sold to investors or paid off, without disclosing any of these facts.

88. By submitting those funding requests, Defendants falsely represented that the loans had not been previously sold or paid off.

89. Defendants knew their representations were false when made as some of the loans had been paid off years before being sold to CapLOC.

90. Defendants made these false representations intending CapLOC to rely on them.

91. CapLOC justifiably relied upon Defendants' representations, not knowing they were false. Defendants had promised to act for CapLOC's benefit and had agreed in the CapLOC MRA and Service Agreement to request funding only for new and current loans.

92. As a direct result of Defendants' fraud, CapLOC suffered actual and consequential damages, including the loss of funds used to purchase these worthless Unauthorized Loans and the lost opportunities from freezing funding of eligible loans that CapLOC should have acquired under the parties' agreements. CapLOC is further entitled to punitive damages because of Defendants' fraud.

## FIFTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duty against McCord, FMC and CBB)

93. CapLOC incorporates all preceding paragraphs for all purposes.

94. CapLOC shared a fiduciary and confidential relationship with McCord, FMC, and CBB. CapLOC reposed its trust and confidence in Defendants to perform warehouse lending

13

functions on CapLOC's behalf while CapLOC built its operations. To facilitate that arrangement, CapLOC entered into the CapLOC MRA and Service Agreement, wherein CBB agreed to act CapLOC's custodian and Defendants agreed to request funding only for newly-originated loans.

95. Defendants breached their fiduciary obligations to CapLOC by using their positions to benefit themselves (and in CBB's case, its associated entities) at CapLOC's expense. Specifically, and without limitation, Defendants caused CapLOC to purchase the Unauthorized Loans without disclosing their ineligible status.

96. Defendants benefitted handsomely from CapLOC's purchase of the Unauthorized Loans. Specifically, some or all of the Unauthorized Loans were owned or funding-committed by ASMC or ASMFC. Thus, CBB caused a portion of the $34 million dollars to go directly to its associated entities, ASMC and ASMFC, and their parents, Spirit and Citizens. The removal of those loans from ASMC and ASMFC's portfolios relieved payment obligations FMC owed to ASMC and ASMFC under the ASCM and ASMFC Loan Agreements. Likewise, CBB earned its fee under the ASMC and ASMFC Loan Agreements for each Unauthorized Loan that CapLOC purchased.

97. As a direct result of Defendants' breach of their fiduciary obligations, CapLOC suffered actual and consequential damages, including the funds used to purchase the Unauthorized Loans and the lost opportunities from freezing funding of eligible loans that CapLOC should have acquired under the parties' agreements. CapLOC is further entitled to punitive damages for Defendants' breach.

**SIXTH CLAIM FOR RELIEF**
**(Breach of Implied Warranties against ASMC, ASMFC, Spirit, and Citizens)**

98. CapLOC incorporates all preceding paragraphs for all purposes.

99. Some or all of the Unauthorized Loans purchased by CapLOC were sold by ASMC, ASMFC, Spirit, and Citizens.

100. Defendants warranted to CapLOC that they possessed good title to the

14

Unauthorized Loans and that the Unauthorized Loans were free from any security interest or other lien or encumbrance. Defendants knew that the CapLOC funding arrangement only allowed for the funding of new loans. When these loans were transferred all Defendants had knowledge of what was occurring – CapLOC was taking on old loans without knowing this was the case. Any Defendant could have at any moment stopped the process and warned that old loans were shifting to CapLOC, yet all remained silent.

101. Defendants breached their warranty with respect to the approximately $17 million of Unauthorized Loans that had been previously sold to investors or paid off.

102. As a direct result of Defendants' breach, CapLOC suffered actual and consequential damages, including the loss of funds used to purchase the Unauthorized Loans that had been sold or paid off.

## SEVENTH CLAIM FOR RELIEF
(Fraudulent Concealment against McCord, FMC, and CBB)

103. CapLOC incorporates all preceding paragraphs for all purposes.

104. McCord, FMC, and CBB each omitted material facts to CapLOC.

105. Specifically, and without limitation, Defendants failed to disclose the funding requests given to CapLOC included requests to fund the Unauthorized Loans.

106. Defendants had a duty to disclose the ineligible status of the Unauthorized Loans as the CapLOC MRA and Service Agreement allowed Defendants to submit funding requests exclusively for newly-originated loans.

107. Defendants concealed the ineligible status of the Unauthorized Loans with intent to defraud CapLOC. None of the funding requests prepared by Defendants disclosed information that would have allowed CapLOC to discover the ineligible status of the Unauthorized Loans.

108. CapLOC reasonably relied on Defendants' funding requests and silence as they were under contractual duties to submit requests exclusively for eligible, newly-originated loans.

109. As a direct result of Defendants' fraudulent concealment, CapLOC suffered actual and consequential damages, including the funds used to purchase the Unauthorized Loans, and the lost opportunities from freezing funding of eligible loans that CapLOC should have acquired under the parties' agreements. CapLOC is further entitled to recover punitive damages for Defendants' fraudulent concealment.

**EIGHTH CLAIM FOR RELIEF**
**(Unjust Enrichment/Money Had and Received/Disgorgement**
**against all Defendants)**

110. CapLOC incorporates all preceding paragraphs for all purposes.

111. Defendants were each enriched by and received money from CapLOC's purchase of the Unauthorized Loans.

112. Defendants' enrichment came at the expense of more than $34 million that belonged to CapLOC.

113. It would be against equity and good conscience to permit Defendants to retain CapLOC's money.

114. CapLOC is entitled to recover and Defendants must disgorge all ill-gotten gains, including the purchase price for the Unauthorized Loans.

**NINTH CLAIM FOR RELIEF**
**(Gross Negligence against CBB)**

115. CapLOC incorporates all preceding paragraphs for all purposes.

116. CBB was CapLOC's agent and custodian charged to disburse funds for new loans at CapLOC's direction and to review and maintain loan documents on CapLOC's behalf.

117. In that capacity, CBB owed a legal duty to CapLOC to act at CapLOC's sole and absolute discretion.

118. CBB breached that duty by causing CapLOC to buy the Unauthorized Loans without seeking, much less obtaining CapLOC's actual consent or authorization. Such conduct by CBB was recklessly indifferent to CapLOC's rights.

119. As a direct and proximate result of CBB's gross negligence, CapLOC suffered actual and consequential damages, including the funds used to purchase the Unauthorized Loans, and the lost opportunities from freezing funding of eligible loans that CapLOC should have acquired under the parties' agreements.

120. All conditions precedent to CapLOC's claims have been satisfied.

## JURY DEMAND

121. Plaintiff hereby demands a jury trial on all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, CapLOC prays that CapLOC have judgment against Defendants, jointly and severally, for:

1. all actual, economic, consequential, and punitive damages;

2. pre- and post-judgment interest as allowed by law;

3. attorney fees;

4. costs of court; and

5. all other relief, both general and special, in law or in equity, to which CapLOC may be entitled.

Dated: New York, New York
July 31, 2017

Respectfully Submitted,

**DIAMOND MCCARTHY LLP**

By: */s/Lon J. Seidman*
Lon J. Seidman
489 Fifth Avenue, 21st Floor
New York, New York  10017
Tel.: 212-430-5400; Fax: 212-430-5499
*lseidman@diamondmccarthy.com*

*[Signature Page Continued]*

17

**CONDON TOBIN SLADEK THORNTON PLLC**
8080 Park Lane, Suite 700
Dallas, Texas 75231
Tel.: 214-265.3800; Fax: 214-691-6311
Aaron Z. Tobin (*pro hac vice application to be filed*)
*atobin@ctstlaw.com*
Jared T.S. Pace (*pro hac vice application to be filed*)
*jpace@ctstlaw.com*

*Co-Counsel for CapLOC, LLC*